Good afternoon. May it please the Court. I'm Jeff Sandberg for the United States and the U.S. Trustee. Debtors in Chapter 11 bankruptcy cases are required to pay quarterly fees to fund the federal bankruptcy system according to a statutory fee formula. The question here is whether the liquidating trustee for these debtors is excused on constitutional grounds from paying the fees required by Congress in a 2017 amendment to the fee formula for future quarters beginning in 2018. In bringing the dispute, the liquidating trustees raised two sets of claims, one involving retroactivity and one involving uniformity. I'd like to begin where we think the bankruptcy court was mistaken, which was its ruling that the 2017 fee amendment is nonuniform. And for structuring that conversation, I think a roadmap or menu of options may be helpful. So I'd like to just quickly list the four grounds on which the uniformity claim fails, and then I'd be happy to discuss any or all of them in more detail. First, the uniformity requirement, there's no uniformity requirement that applies here at all. This case involves a user fee, not a duty, impost, or excise. So the uniformity provision of the taxing and spending clause does not apply. And then the term uniform in the bankruptcy clause applies to substantive bankruptcy laws that alter debtor-creditor relations and not to auxiliary laws that set up the machinery of the bankruptcy system, like the quarterly fee statute here. Second, and this is the ground the Fifth Circuit recently relied on in upholding the constitutionality of the 2017 amendment against a parallel challenge, even if a uniformity condition applies to the quarterly fee statute, no one here has disputed that Congress acted within its authority in setting up the U.S. trustee program and then in deferring to local judicial preference in certain bankruptcy administrator districts as to whether to opt in to the U.S. trustee program. And once you accept, as I think the liquidating trustee does, that it's fine to have these two programs, there is no problem with Congress funding each one separately and even potentially setting different fees within each program to meet the needs of each. Again, that's the rationale in which the Fifth Circuit relied on in buffets. Third, even if you thought that uniformity required the fees to be equal across the two programs, that's actually what Congress provided for here. For decades, Congress has specified that the quarterly fees in the bankruptcy administrator districts, those being the districts in Alabama and North Carolina, are to be equal to those in U.S. trustee districts, and that's how everyone, including the bankruptcy administrator districts, had understood and applied the law since 2000. The fact that there was a difference in the implementation of one of the fee changes in 2017 doesn't change the fact that the laws were uniform on their face. And fourth and finally, even if there were a constitutional problem with the non-uniform application in this case, the remedy would not be to order that the debtors don't have to pay their statutorily required fees. The liquidating trustee here is essentially complaining that the statute was correctly applied to them and there are other debtors elsewhere who are given an undeserved windfall, an unexplained break by the bankruptcy administrator districts. Even if that's true, that doesn't mean these debtors are entitled to the same undeserved break. Congress was clear about what uniform fee schedule it wanted, and under Supreme Court precedent, that controls the question of whether there's any remedy available for these debtors. It's just like the Morales-Santana case where the Supreme Court said, yes, there's a constant, there's a problem with treating the children of unwed mothers different than the children of unwed fathers, but this particular person does not get a remedy because the right result is to eliminate the special treatment for unwed children of unwed mothers. With that, I'd be happy to address any of those uniformity grounds in more detail or turn to the retroactivity issue if the court would prefer. I have this, Judge Qualabong. I have some questions on the uniformity issue. Maybe this isn't being advanced, but is there anything about North Carolina and Alabama as a state that justifies having an entirely different system of administration than the other 48 states? Your Honor, it's not to my knowledge. The liquidating trustee hasn't argued that there's a constitutional defect with that, but the explanation I would give is it's a creature of local judicial preference, just as the fact that this court doesn't have a bankruptcy appellate panel, but the 1st, the 6th, the 8th, the 9th, the 10th, those circuits have chosen to create one. That was because Congress there also enacted a statute that said if the judges of those circuits want to have a panel, they can have a panel. Here, Congress enacted a statute in the 1980s that said, you know, Alabama and North Carolina can opt into the U.S. trustee program anytime, and they just haven't pulled the trigger to do that, so it's a different local judicial preference. The example you gave, as I understand it here, Alabama and North Carolina, you know, have an option to opt in, but no one else has an option to opt in, and in the example you gave, everyone had the option about having a bankruptcy appellate counsel. Isn't that right? That's right. I don't think there's a difference in the constitutional analysis based on that fact. I mean, it's uncontroversial that each local district can have local bankruptcy rules, and indeed we can have different federal judicial districts to begin with and different circuits to begin with, and if the substantive bankruptcy law is uniform, it's fine to have variations in the procedural trappings of that. Yeah, but this is, I mean, you're making it sound like it's a little minor issue. I mean, you're talking about a substantial economic difference that a debtor has in every state in the union other than North Carolina and Alabama, and the only reason, it seems to me, is that it's related to geography, that the laws of those two states elected not to opt in, and they were given that right different than the rest of the states, and I guess more importantly, it's really not, part of it's a debtor issue, but is it really a creditor issue? Because those amounts that, you know, increased amounts are amounts that don't go to the creditors, in particular the unsecured creditors. I think all of what you've said is correct, Judge Quattlebaum, but for two reasons, it just doesn't get you anywhere in this case. First, the liquidating trust, we treat Congress's handiwork as constitutional, right? We presume statutes to be unconstitutional, and no one who is standing in this case is before you saying that it's unconstitutional that Alabama and North Carolina have a different system of bankruptcy administration. That claim is not before you, so if you accept, as the Fifth Circuit did, the premise that it's constitutional to have broken off Alabama and North Carolina into a different system, then the question is, does Congress act uniformly in setting the same fee within each system? And the answer to that is yes. And the second important thing to realize is Congress did not actually intend for Alabama and North Carolina to have different fee rates. Congress said that if you, you can fight about whether the statute is permissive or mandatory, but one thing is clear, if fees are going to be charged in bankruptcy administrator districts, as they have been since 2000, they have to be equal to the fees under A-6. And they weren't, for this, starting January 1st, 2018, the fees weren't equal, and Congress did not allow that. So there's not a, that might be a statutory problem, and you know, it's concerning when there's a large fee increase that takes effect in some districts and not others, but if that's a problem, it's a statutory problem. It's not a constitutional problem because Congress didn't permit it. Is it, on that issue, is the permissive aspect, however, what allows that? Because here, you know, I realize one issue is the delay from January to September, October, but beyond that, you have the fact that in the trustee districts, it applies to existing cases, and in the bankruptcy administrator districts, it only applies to new cases. Doesn't that, doesn't that kind of creates a uniformity problem? I don't think that's right, Your Honor. There's nothing in the statutory text that says, you know, the judicial conference at its discretion may, you know, choose not to apply fee increases to pending cases or can delay the implementation by any length of time. I mean, what's particularly curious is the judicial conference, when the statute was first enacted, everybody understood that when A-7 was enacted, which is what says the bankruptcy administrators may charge fees equal to, everyone understood that the purpose of that was to solve any conceivable uniformity problem with a statute. Everybody had the intention that the bankruptcy administrator districts were going to start charging equal fees right then and there, and so in 2001, the judicial conference issued an order that specifically said, directed the bankruptcy administrator districts to impose fees in the amount specified in A-6 as those amounts may be amended from time to time, and, you know, the bankruptcy administrator districts did that in subsequent fee increases enacted by Congress. It's not clear why they didn't do that in 2018, but even when they acted in 2018 and made it applicable only, you know, for new cases in October 1st, they then said, okay, and we want this to be effective for any, quote, future extensions to that or similar authority, end quote. So again, the judicial conference was saying, we think, you know, we need to be in lockstep with what the U.S. trustee program districts are doing, and it's just, it's not clear. There were no findings made by the judicial conference. They acted on an expedited basis. Actually, the executive committee of the judicial conference acted on an expedited basis at the request of a subcommittee to impose this, and so, you know, I haven't seen a principled explanation for why it can be laid at Congress's feet for this non-uniform implementation that happened in 2018. Where's the authority to your argument that if it's the issue of substantive versus auxiliary? I understand that concept conceptually. What's the best case you have that would indicate that, you know, number one, this is not substantive, something that affects the creditors in this way, and number two, if it's not, that it's exempt from the uniformity requirement. Could you give me the best authority you have on that? Yes, and with the indulgence, I have kind of two ways I want to answer that, because I don't have a smoking gun to point you toward. The first thing I'd point you to is the Supreme Court's decision, fairly recent within the past couple decades, I think, in Central Virginia Community College versus Katz that looked to the history of the bankruptcy clause, and the Supreme Court said that the bankruptcy clause is unique among constitutional provisions in that it itself waives state sovereign immunity. Usually, if a state's sovereign immunity is going to be waived, Congress has to pass a statute and be very clear that that's what it's doing, but the Supreme Court actually held that the bankruptcy clause itself waived state sovereign immunity and looked to the fact that it contains the uniformity provision. The Supreme Court explained that the uniformity provision is an affirmative grant of power to Congress to override inconsistent state laws, but along the way, the Supreme Court said, look, just because a law has to do with the bankruptcy system in some way doesn't necessarily mean that it waives state sovereign immunity. There's a core here, a core of substantive bankruptcy law that waives state sovereign immunity, but it's not that anything that has to do with bankruptcy or has the word bankruptcy slapped on it would do so, and so the Supreme Court has rejected, I realize that's a slightly different context because of state sovereign immunity, but has realized that there is a core substantive power where Congress has tremendous power, although it has to be uniform, and then there's the auxiliary stuff. The other way I'd like to respond to Your Honor's question is to just point out that we're interpreting this constitutional provision in the context of Article I, Section 8 as a whole, and if you run down the list of all the clauses there, you see a long list of substantive powers that Congress has. It can regulate commerce. It can regulate the armies and the navies. All of these things are substantive powers to do things, and if Congress sees fit to establish an administrative regime to help regulate commerce, for example, and wants to charge a user fee as part of that regime, all of that rests on the Necessary and Proper Clause, which provides Congress the kind of nitty-gritty tools to work out the details of a regime, and our submission is that the Bankruptcy Clause works just the same way. Congress has substantive power to displace state law regulating creditor-debtor relations when you're dealing with insolvent debtors or non-paying debtors for whatever reason, and Congress has power under the Necessary and Proper Clause to set up the trappings of that regime, and there's no reason to read the substantive power in the Bankruptcy Clause any differently in terms of a substantive procedural distinction than any of the other constitutional powers in Article I Clause, Section 8. And what's important about this, I mean, you know, the Fifth Circuit didn't resolve this issue and skipped ahead to the second round, and as my adversary is likely to point out, you know, many of the bankruptcy courts that have looked at this issue and said, well, quarterly fees have to do with bankruptcy, and it's a lot of money, so why wouldn't we say that it's a, you know, it's a substantive bankruptcy law or say it's a law on the subject of bankruptcies, but there's lots of other stuff that Congress has authorized, like bankruptcy appellate panels from one circuit to the next, that it's hard to see, you know, how they would be constitutional if auxiliary laws aren't exempt from the uniformity requirement, and this court specifically chose not to adopt a bankruptcy appellate panel in 1995 because it found it would result in, quote, increased costs to litigants. So this court itself thought that the bankruptcy appellate panel was more costly, and so, you know, the analogy here to the big quarterly fee statute seems pretty strong to me, frankly, that you've got, you know, for some length of time, there's a higher fee schedule in place for bankruptcy administration in some districts than others. I don't think that was Congress's choice to do so, but be that as it may, it's like the bankruptcy appellate panels circuits. Congress provided for a regime in which for these auxiliary matters, there's some deference to local judicial preference, and no one has ever thought that to be unconstitutional. Did you argue the case in the Fifth Circuit? I did. And is there also one in the Second Circuit? That's right. There was an argument in the Second Circuit by a co-counsel about six weeks ago, I think. You didn't argue that one? That's right. So you're going all around the country with this. It's become a bit of a cottage industry, Your Honor. After the Buffet's case, which is the Fifth Circuit case. If we disagree with you, we've been creating a circuit split. Is that where it is right now? That's right. I think the easiest way to dispose of this would be to agree with the Fifth Circuit's reasoning, in which case there would be no circuit split. And the Second Circuit, they're still pending. That's right. Are there others awaiting argument? There are cases being briefed in the Tenth and Eleventh Circuits. I don't think any other are ready, ripe for argument yet. Okay. But there's a split among the bankruptcy courts with slightly favoring your position. Is that right? On the uniformity issue, that's right. And then also on the retroactivity issue, there was a split that was even more lopsided in the government's favor. Okay. You're running the retroactivity more solidly than you are the uniformity. That's right. Okay. And they've all skipped the district courts, right? And go to the courts of appeals? Most of them have. There's one case I'm forgetting which district now, and in which it's going to the district court first, a case called SCI Direct. But for the most part, litigants have recognized that this is a novel question. It deserves careful attention from appellate minds. The final analysis of the Supreme Court might very well have to resolve it, right? It may if there's a circuit split, although we believe that it's clear enough that the government shouldn't have to go there. Go ahead. I didn't mean to get you off track there. Sorry. Well, if your honors would like to hear about the retroactivity issue, I'd be happy to speak to it. But I also had saved four minutes for rebuttal, and I'd be happy to speak to it then. So I just don't want to eat up too much of my rebuttal time now. Why don't you sum it up there? I'd like to hear it. Okay. Well, to sum it up, the Supreme Court has been very clear about how you work through a retroactivity analysis. The first thing you do is figure out whether Congress expressly said when and to whom a statutory change should apply. And we think that Congress was totally clear here. The statute says that you pay a quarterly fee in each case and for each quarter that the case remains pending. That's the language of 1930A6. And then Congress popped in in 2017 and said, I'm going to amend that fee schedule in A6. And that amended schedule will start in the first calendar quarter after this law is enacted. And that would be the calendar quarter starting January 1, 2018. So Congress has said, right there, all these cases in which quarterly fees are being paid, there's a new schedule effective January 1, 2018. And you don't need to think hard about whether this would be retroactive or prospective. But even if you do get to the question of whether this would be a retroactive or prospective application, it is prospective because it is a change in fees to be paid in future quarters. Just like a post-confirmation debtor isn't immune from paying an increase in, say, property taxes or isn't immune from new regulations that might come down in their industry, they're not immune from any increases in fees that Congress might impose. And the fact that they may have had an expectation in 2010 that 10 years when this plan was confirmed that eight years down the road their fees would be X rather than X plus Y isn't a reason that the statute is retroactive. And with that, I'd like to save whatever remaining time I have for rebuttal. Very good, sir. And let's just track, sir, did Paul Baum have a question? No questions. No more questions. Mr. Payne, you're going to clear all this up for us? Thank you very much, your honors. It's a pleasure to be with you today. Good to have you with us, sir. I appreciate it. Thank you. I'm going to address the issues in the same order as Mr. Sandberg, but then I'm going to hope to spend a little more time on retroactivity. Starting with uniformity, it is clear that, as Judge Qualibon pointed out, there was not uniformity here. There was a different fee schedule until October 1 of 2018 in the bankruptcy administrator districts than there was in the trustee district. And so the government is attempting not to argue that it wasn't uniform, but that's okay that it was uniform. And I want us to understand that what the government is fee hurts creditors at the bottom line. Again, as Judge Qualibon pointed out, and I'm going to spend quite a bit of time on in my argument, those who are injured by the increased fees are not the debtors that chose to file the bankruptcies to begin with, but they are the creditors who are dragged into these bankruptcies. And in a typical bankruptcy context, you have secured creditors, lien holders, lenders, and the like who generally get paid. And then you have the unsecured creditors who, if they're lucky in many of these cases, don't even get 10 cents on the dollar. And so if you are going to allow different fees in different parts of the country, those creditors are going to be treated differently depending upon where the bankruptcy takes place. And that seems inherently unfair on its face. The justification suggested by the government is that this is all an administrative process to the United States trustee system, and so it's okay for us to have different fees. But those of us who have participated in the Chapter 11 process can tell you that the U.S. trustee is not merely an administrator. As the Ninth Circuit's explained in the San Angelo decision, the United States trustee is actively involved in the bankruptcy process, including on many substantive issues, whether a trustee should be appointed or not, whether a case should be dismissed or not, whether there should be fee examiners objecting to fees itself. The United States trustee system is not simply a procedural system. And so the fees charged for that system, I think, are inappropriately characterized as procedural or as user fees. And so we have clearly non-uniformity before October 1, 2018. That is going to ultimately cost the liquidating trust here $800,000 more if the government's position is adopted. And that's just not right. Counsel, let me interrupt you, if I may. This is Judge Quattlebaum. If you could frame the exact challenge you made that your colleague pointed out or argued or said that you're not really changing the fact that we have two different bankruptcy systems, your challenge is more narrow than that. I guess, you know, it's the narrowness relates to this specific fee issue. And I understand that's the emphasis of this, but doesn't this really derive from the fact that we have two separate systems here and they just operate differently? Yes, Your Honor. The argument was first fully flushed out in the buffet's decision by the appeals. Okay. We're not arguing the Congress couldn't set up these two different systems. Personally, I don't think it makes a lot of sense. But if you're going to have two different systems, you shouldn't penalize the creditors who are ultimately looking for some recovery out of these systems based on a different fee schedule. And if you take the government's argument to its logical extreme, you could charge thousands of percent more in one system than you do in another system. And that would still be constitutional. And that's going to be the same argument you're going to hear from me on retroactivity. They want a blank check. And they want a blank check in order to fund a system going forward. And yet they're asking, in this case, to liquidate Circuit City Liquidating Trust, which is I'll explain in a minute, doesn't even use the U.S. trustee system anymore to pay for a large deficit that the U.S. trustee system has been accumulating over a number of years. I don't think that's what Congress intended. So what's your argument on the remedy? Your colleague said that even if it were to lose on all three of those issues, and even if there's a constitutional problem, you shouldn't get the bankruptcy administrative VA state should have the same fees as A-6 allows. Your Honor, we're not asking to pay nothing. We're asking for the old schedule to apply through October 1 of 2018. And that's an $800,000 difference. That's true. The point is, I guess, for that, the point is, if that, if A-6's new schedule is non-uniform, then it's improper under the Constitution, and you should have the old schedule. That's the way the logic goes? That's correct. We're not asking to pay nothing. We're asking to go back to the old schedule where the United States trustee fee was relatively administrative, no more than $30,000 a quarter. Now it could be $250,000. Unless there are other questions, I'd like to move to retroactivity. Move right along there to retroactivity. That'd be good. Thank you. Judge Hennekens, in his decision in the bankruptcy court, noted that expressly described that the 2018 amendment would apply retroactively. And counsel argues otherwise, but if all we need to do is look back to the prior situation, as Judge Hennekens indicated in his decision, Congress did not expressly provide for retroactive application here. If we look back to the last time it passed legislation on fees in 1996 and 1997, which was involved in the H. Robbins decision, there was a question as to whether it applied to prior cases, and Congress had to go back and say, yes, it does apply to cases that had been filed prior to the applicable date, even if they were confirmed. Congress didn't do that in the 2018 amendment that Judge Hennekens points out. So since it's not clear that this is to be applied retroactively or not, then we need to turn to Landgraf to decide whether or not it should have retroactive effect. And I'm going to refer specifically to one provision of the Landgraf quote, which asks whether it imposes new duties with respect to transactions that have already been completed. And I want to spend a little time talking about what happens before confirmation of a plan, so hopefully I can convince your honors that this is a transaction that was already completed and that rights have already been set in stone prior to the changing of this amendment, so that it should not be applied retroactively. When parties get together to try to negotiate a plan of reorganization, there is generally a debtor which is operating or hoping to continue to operate, negotiating with creditors of all kinds, whether they're lien holders with security interests or unsecured creditors or many other constituents, in order to try to determine whether an arrangement can be made so that the debtors can continue to operate even if they don't pay all creditors in full. These negotiations are often very charged and hotly contested. And by the time we get to a plan, an agreement has often been forged among all these constituents that is going to lock their rights in stone after the confirmation of a plan. And once those rights are locked, it signifies that all those creditors have agreed that they are going to abide by the plan. And in understanding how to make that decision, they are operating based on projections as to how much they're going to get paid. And as I mentioned earlier, for general unsecured creditors, that is often less than 10 cents on the dollar. So rights have already been fixed when a plan is confirmed. And that's what section 1141 of the Bank of Dakota provides. It's the effect of confirmation is to get a contract that vests substantive property rights on all parties, whether or not they voted for the plan. In the Circuit City case... Mr. Cain, let me interrupt you just a sec. Mr. Cain, this is Judge Traxler. In describing the expectations of the parties when they enter into a plan, how would the assessment of these fees differ from a new tax that was imposed after the plan was agreed on? Judge Traxler, this is the analogy that I would try to create. Once a plan is confirmed and creditors know more or less what their recoveries are going to be, to implement a new tax of an amount that, according to the government, could be any amount. It doesn't matter. It would be constitutional no matter what. It's akin to somebody going into a post office and paying the money to mail their package. The package is taken by the clerk and then on their way out, they're asked to pay some more. They didn't, on their way in, know exactly what they were going to pay. And then they were asked to pay more on the way out. And again, it's important to recognize that those hurt here are the creditors. I'm sorry to interrupt you, Mr. Cain, but your position would be that if this were a tax, it would also be unconstitutional. I'm hesitating to answer your question, Your Honor, because... That's okay. I hesitated to ask it. I appreciate that. It's characterized here as a user fee. And what I want the panel to understand is that the creditors who are being penalized by this increased fee are, yes, participating in the system, but they didn't start it voluntarily. And also what I want the panel to understand is that the U.S. trustee's involvement in a Chapter 11 case is generally at the beginning and pre-confirmation. Once a plan is confirmed, there is very little, if any, involvement of the United States trustee other than in collecting fees. A quarterly report is filed by a post-confirmation estate and the trustee sees how much the fee should be under the prior schedule up to $30,000 a quarter. So there isn't really using of the system by a post-confirmation bankruptcy estate because the U.S. trustee's really not involved at that point. So it is particularly unfair to apply this increased schedule to a large post-confirmation liquidating estate, asking it to pay for the operation of the United States trustee system that it's not availing itself of. Mr. Cain, let me ask one question. If circumstances, be they related to a fee increase like this or some other circumstance related to the way in which the debtor is rehabilitating, is there an opportunity under the bankruptcy code to move for a modification of the plan to adjust payments either in amount or the time that the payments are due to adjust for economic changes like it might come about? As a practical matter, no, your honor. I just, yeah, I actually did some bankruptcy a while back and I have like, I'm losing my memory maybe more than I'd like to admit, but I remember like motions to modify plans and things like that. Am I just not remembering correctly that that was a procedural vehicle that you could utilize under the bankruptcy code? The statute provides for the ability to modify a plan, but you're not going to be able to modify the shares in a smaller pool of resources through modification of a plan. So when the confirmation agreement is reached, there's generally an understanding that secured creditors are going to take X percent and they're going to leave a certain amount of money for general unsecured creditors if they're taking a haircut on their own. It's a modification of the priority and payment system and to go back and modify a plan to change that on behalf of unsecured creditors because they're getting hurt by an exponential increase in a U.S. trustee fee, I think that's dead in the water. Okay. I think I heard your bell go off, Ms. Gaines. Yes, indeed, your honor. Thank you. But you say you've got some time saved. And now Mr. Sandberg, we'll go back to you again. Yes, thank you, your honor. Just one quick point on retroactivity before I switch back to uniformity. It really can't be right that what's in the creditors' minds in 2010 should control what fees they have to pay down the road. And one really good example of that is in 2010, the creditors thought that this liquidating trustee was going to wrap up after five years. The liquidating trust was authorized for five years. And it was only because the trustees sought further extensions. And I'm sure there were circumstances outside the trustees' control that contributed to that. But it was only because of the multiple extensions for liquidating Circuit City that we ended up in a situation where this increased fee applied to them at all. Anybody who participates in bankruptcy knows that at a certain point, to keep the case open, to keep litigating, there are trade-offs. You have to keep paying quarterly fees if the case is still open. And if there's not much chance of recovering on the remaining claims, you just close the case. So it can't be right for lots of reasons, but including that the liquidating trustee himself decided that the creditors have to keep paying quarterly fees by keeping the case open past the original five-year period. On uniformity, I didn't really understand my colleague's answer to the remedy question that was asked. My colleague said, well, we're not saying we don't have to pay any fees. They're saying we just want to pay the reduced fees. But the remedial question is, what would the uniform fee schedule look like that Congress would intend? And I think everybody agrees Congress intended the bankruptcy system to be paid for by users rather than by taxpayers. And the remedy that my opposing colleague is suggesting is that the fee increase that Congress put in place to keep it a user-funded system should be disregarded and that taxpayers should be on the hook for the increased fees necessary in order to maintain the bankruptcy administrator system. And that's clearly not what Congress intended. And following in the Morales-Santana remedial analysis, which my opposing colleague didn't even brief, I think you could resolve that case on that independent grounds alone. His suggestion that our understanding of the uniformity provision of the bankruptcy clause would allow Congress to impose a 1,000% fee increase in only one state and not another isn't right. We're arguing that the court should be turning square constitutional corners here and it's not the uniformity condition of the bankruptcy clause that would provide a check on that sort of law. But the Supreme Court has repeatedly said that a law fails under the due process clause if it's imposed for an arbitrary and irrational reason. Congress isn't allowed to throw darts at the wall in deciding which debtors have to pay millions of dollars of fees and which don't. It has to be rationally related to what Congress is doing. But here they haven't disputed that it's constitutional to have two different systems. And once you accept that premise, it is rational to have one fee that applies uniformly in the U.S. trustee program and another fee that applies uniformly in the bankruptcy administrator program. Of course, our further submission is Congress provided for that same fee to be equal across the two programs and it's just that there was a lag in the implementation in one of them. But be that as it's made, Congress would have the authority in the first place to set up a different fee in the U.S. trustee program if it is unconstitutional. The U.S. trustee program is actively involved in managing bankruptcy cases, particularly at the start and pre-confirmation, but it also plays a role in many post-confirmation cases. But the bankruptcy administrator program performs the same exact role. That's not a distinction that has any bearing here on whether this is a law on the subject of bankruptcies or not. I mean, it's not as though only the U.S. trustee program is performing the functions that my opposing counsel referred to. So just as, you know, the courts across the country are playing a really important role, but similarly, you know, the law is setting up the machinery of the courts we think is non-substantive and therefore doesn't implicate the uniformity provision of the bankruptcy clause. If there are no further questions, I would ask that the court reverse the uniformity ruling, but otherwise affirm. Any further questions for Mr. Sandberg? Not from me. Me either. Thanks. Very good. Thank you, Mr. Sandberg. Appreciate it. Mr. Kane? Yes, thank you very much, Your Honor. Addressing first Mr. Sandberg's comments, it is true that the liquidating trustee in this case has requested multiple extensions of the term of the trust, and he did so in every instance to enable creditors to recover as much as possible. And in fact, the liquidating trustee in the Circuit City case has done very well in litigation and has recovered 55% for general unsecured creditors. So by all references, it's a very successful case. But it's not right to put the liquidating trustee to a decision to stop litigation in order to avoid paying fees. He made the decision to extend the trust, knowing that along the way, the fee paid to the U.S. trustee system would be relatively nominal at $30,000 maximum per quarter. And so to change that to $250,000 maximum per quarter is an imposition on unsecured creditors that is not rational. The argument that if there are two systems per se, different treatment in those systems is rational is a non sequitur. How is it fair to creditors in Virginia or any other state besides North Carolina and Alabama to have them get less money out of what would otherwise be the same bankruptcy system? It's not uniform, and it shouldn't be allowed to penalize creditors. Thank you, Mr. Kane. Yes, may I address Retroactive? Oh, sure, you go right ahead. Yeah, I thought you paused there, and I thought you were wrapping it up. No, you go ahead. Thank you. I speak slowly sometimes, Your Honor. The Fifth Circuit in Buffet's, which, of course, we hope you decide differently from, addressed the retroactivity question by saying, by asking whether the amendment's negative effects on debtors stem from events completed before the enactment of the law, and it concluded not. But the liquidating trust is hoping that Your Honors will decide that, in fact, all of these events were completed in the confirmation of this case in 2010, and that the parties whose rights were fixed, the creditors, are the ones who are harmed by what is now clearly retroactive application of this fee increase. The legislative history around the 2018 amendment indicates that it is intended to address deficits in the U.S. trustee program based on activity going forward. And so to ask creditors of Circuit City to pay for deficits that occurred prior to the 2018 amendment at a time when they're not using the U.S. trustee system and they're only paying fees is a retroactive application that impairs the rights of parties whose rights have already been fixed. And so we're asking this panel to focus on creditors and not on debtors, which virtually every court has up to this point in time when assessing whether this is a retroactive impairment of rights, and we suggest that it is. And so based on retroactivity and based on non-uniformity, we ask the panel to strike down the fee statute as unconstitutional. Do you want us to sustain the ruling of the bankruptcy court? I would like you to sustain the ruling of the bankruptcy court that it is unconstitutional but not uniform, but also overturn the ruling of the bankruptcy court that it is not retroactively unconstitutional. That's why there's a cross appeal here. I'm with you. Okay. Thank you very much. Any other questions? Not from me. No questions. Madam Clerk, we appreciate council's participation remotely and this case will be taken under advisement and we can adjourn court for the day and you can put the panel into conference, however you do that. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Robert B. King, A. Marvin Quattlebaum Jr., William B. Traxler Jr.